The judgment of the United States Customs Court, Third Division, is *affirmed*.

UNITED STATES *v.* TIDE WATER OIL CO. (No. 3476)[1]

United States Court of Customs and Patent Appeals, March 7, 1932

*Charles D. Lawrence*, Assistant Attorney General (*Peter A. Abeles* and *Philip Stein*, special attorneys, of counsel), for the United States.
*Siegel & Mandell* (*Samuel T. Siegel* of counsel) for appellee.

[Oral argument February 11, 1932, by Mr. Stein and Mr. Siegel]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

LENROOT, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court in reappraisements 97807–A and 97810–A to 97815–A, inclusive.

The merchandise involved is an oil-refining plant purchased by appellee in Germany and imported into the United States in seven

shipments, for which seven entries were made, six of them under the Tariff Act of 1922 and one under the Tariff Act of 1930.

The single judge sitting in reappraisement sustained the entered value of the merchandise, and upon appeal by the Government the Customs Court, First Division, made the following findings:

1. That the machines in question were manufactured in Germany for the plaintiff company.

2. That there was not any foreign value for said machines.

3. That there was an export value for said machines.

4. That such export value was the invoice price thereof, viz, $192,700, and we find the value of the merchandise on the date of shipment to be that sum, plus packing.

The judgment of the lower court is affirmed.

In its judgment, from which this appeal is taken, it ordered and adjudged—

that the merchandise described in the invoices is dutiable according to the export value thereof, being the invoice price, viz, $192,700, to which is added packing.

The aggregate of the entered values in said seven entries is $192,700.

The appraiser accepted such entered values, plus the sum of $100,000, allocating the latter to the said seven entries by increasing the entered values of the merchandise embraced therein approximately fifty per centum, thus arriving at an appraised value of the entire plant of $292,700.

It appears that appellee purchased the merchandise here involved under a contract with a German firm, of which Dr. Larzar Edeleanu was the managing director. Said contract was introduced in evidence by appellee. This contract, a report of a special agent of the Government, and the testimony of said Edeleanu comprise the entire evidence in the case admitted upon the trial.

From the evidence it appears that the oil-refining plant in question was constructed and designed for the purpose of refining distillates of petroleum by a chemical process patented by said Dr. Edeleanu. Said contract involved the purchase by appellee of the said plant and a license to appellee to use said process in the United States, which process was covered by United States patents and applications for patents.

The provisions of said contract giving rise to the principal controverted question before us are as follows:

1. Licensor grants to licensee a license to use in the United States of America said improvements and inventions covered by said United States letters patent and applications for patents, and all other developments of said process, and improvements and inventions for carrying out the same, so far as owned by licensor up to the date of conclusion of this agreement;   *   *   *.

2. The licensor agrees promptly to communicate to the licensee all improvements and inventions which licensor may discover or acquire hereafter during the term of this contract either in the said process and/or in the plant hereinafter

agreed to be furnished by licensor, and in any other plant that may be furnished by licensor to licensee, and the licensee shall be entitled to use such improvements and inventions subject to the terms and conditions hereof and without any additional payment or royalty other than as provided in paragraph 5 hereof, and the licensee likewise agrees promptly to communicate and give licensor and its licensees under similar agreements the right to use any improvements and inventions which licensee may discover or acquire in the future during the term of this contract, either in said process *or in said plant and without any payment or royalty.* Said improvements and inventions shall be communicated by one party to the other irrespective of whether or not the same may consist of a patentable invention. (Italics ours.)

\* \* \* \* \* \* \*

5. For the use of said services, information, experience, process improvements, and inventions, or any of them, the licensee will, during the term of this contract, make the following payments in respect of all products treated by the licensee under this agreement:

25¢ per ton on gasoline distillate charged into the plant, but in case the sulphur-dioxide extract is used for blending to produce motor fuel the rate shall be 50¢ per ton on the gasoline distillate so charged.

50¢ per ton on kerosene and gas oil distillate so charged.

66¢ per ton on lubricating-oil distillate so charged.

77¢ per ton on cosmetic and medicinal-oil distillate so charged.

\* \* \* \* \* \* \*

6. The licensee guarantees and agrees to pay to the licensor a minimum sum of $20,000 in U. S. gold per annum for a period of five years from the date of the completion and placing in commercial operation of the plant to be furnished and erected as hereinafter provided; said guarantee and the calculations for said payments hereinbefore set forth shall be based upon the calendar year, commencing January 1st, and necessary adjustment shall be made for the fraction of the first year remaining after the erection of said plant. Accountings shall be made by the licensee to the licensor on the 30th day of June and the 31st day of December of each year of the quantity and character of distillates so charged during the preceding six months' period, and payments accrued hereunder shall be mailed thirty days thereafter to the order of the licensor. Any deficiency in the minimum payments provided as aforesaid for the six months' period shall be made up at the time that the semiannual payment is due, and such deficiency payments shall be applied in payment of subsequent amounts due in excess of said minimum royalty guarantees.

\* \* \* \* \* \* \*

8. The licensor hereby offers and agrees to sell and the licensee agrees to purchase a commercial plant for the daily treatment capacity of—

2,550 bbls.=360 tons of lubricating-oil distillate using 100% by vol. of liquid sulphur dioxide, or

1,750 bbls.=250 tons of lubricating-oil distillate using 150% of liquid sulphur dioxide, or

1,250 bbls.=180 tons of lubricating-oil distillate using 200% of liquid sulphur dioxide,

by said process, in accordance with and for the price set forth in the estimate and upon the guarantees with respect to working capacity of the plant, its comsumption of power, water, sulphur dioxide, and steam, and subject to the terms of delivery and payment, all of which with data necessary for the calculation of the operation cost have been submitted to the licensee and contained in the "quotation" attached hereto, marked "Exhibit B" and made part of this contract.

Other pertinent provisions of the contract set forth detailed prices for various parts comprising the plant and that the prices quoted are for delivery f. o. b. Hamburg or Rotterdam. The aggregate of the prices so quoted is $192,700. One-third of the purchase price was to be paid with order, one-third when the goods were "delivered f. o. b. Hamburg or Rotterdam, or f. o. b. American railroad station," and one-third two weeks after the plant was started, or, if the erection and starting were delayed through no fault of seller, then said final one-third was to be paid six months from notification that the goods were ready for shipment. The seller agreed to provide, if required by appellee, a skilled erector to supervise the erection of the plant, whose expenses and a fixed compensation should be paid by the purchaser.

The Government contends that, as it construes the contract, the appraised value of $292,700 was the price which appellee agreed to pay for the plant "at all events," and that, even if appellee's contention that said contract should not be construed as requiring appellee to pay said $100,000 provided for in paragraph 6 as a condition of the purchase of the plant be correct, it was incumbent upon appellee to show that plants such as or similar to that here involved were freely offered for sale in Germany at the invoice price, and that there is no such proof in the record.

Appellee contends that the said contract and testimony of Dr. Edeleanu contain all the facts necessary to prove every element of export value required by law; that the $20,000 per annum for five years set out in paragraph 6 of the contract should not be added to the invoice value to make dutiable value because, as it interprets the said contract, this sum represented a payment on account of royalties for the use of the patented process, and was not to be a payment upon the plant. In other words, appellee contends that the payment of said $100,000 was a part of the license agreement of the contract, wholly disassociated from the purchase price of the plant.

The first question for consideration is whether the five annual payments of $20,000 each, set out in said paragraph 6 of the contract, should be considered as a part of the purchase price of the plant.

Both the single judge, sitting in reappraisement, and the Customs Court, First Division, in well-considered opinions, held to the contrary, and we are clear that they were correct in so holding.

Said paragraph 6 of the contract is found in that part of the document relating to the license granted to appellee to use the patented process therein referred to, and it was clearly intended that said $100,000 provided for therein was to be compensation to the seller for the right to use the patented process and did not in any way relate to the right to use the plant purchased. The only relevancy that the plant had to this part of the contract was to fix the date when the

payments of $20,000 annually for five years should begin to accrue, to wit—

from the date of the completion and placing in commercial operation of the plant to be furnished and erected as hereinafter provided.

We do not find in the contract any obligation upon the part of appellee to erect or use the plant purchased. We agree with the lower court that title to the plant passed to appellee in Germany, and, if the plant had been lost at sea in transit to this country, appellee would have been obligated to pay the seller only the invoice price thereof, viz, $192,700, and there then would have been no obligation to pay the $100,000 provided for in paragraph 6 unless appellee used the *process* licensed by the contract.

We are of the opinion that the $100,000 provided for by said paragraph 6 is a minimum-royalty provision, in part payment of the right to use the patented process, and that the payment thereof was to accrue after appellee had acquired title to the plant and had erected the plant in the United States.

The Government contends that the case at bar should be governed by our decision in the case of *General Dyestuff Corp.* v. *United States*, 19 C. C. P. A. (Customs) 309, T. D. 45480, wherein it was held, in arriving at the United States value of certain merchandise, that a ten per cent addition to the basic price per pound of the merchandise, collected by the seller as a so-called royalty for the use of such merchandise in a certain patented process, was a part of the purchase price of the merchandise.

In that case the purchaser could not obtain title to the merchandise without first paying or agreeing to pay the so-called ten per centum royalty. We there said—

The merchandise was not—

freely offered for sale * * * in the principal market of the United States to all purchasers * * * in the usual wholesale quantities and in the ordinary course of trade * * *,

at a price which did not in every instance, so far as this record shows, include as a part thereof said ten per cent of the basic price *added to such basic price.* (Italics supplied.)

In the case at bar no such facts are present, but, on the contrary, as we construe the contract and according to the testimony, in no case is the minimum royalty added to the invoice price of the plant, but appellee secured complete title to the plant sold without paying or agreeing to pay the said minimum royalty as a part of the purchase price thereof.

For this reason, we do not consider said case as being in point in determining this question.

A like observation is applicable to the case of *International Forwarding Co.* v. *United States*, 17 C. C. P. A. (Customs) 86, T. D.

43377, relied upon by the Government, because in that case the royalty in issue was exacted and paid as a part of the purchase price of the merchandise.

In the case of *United States* v. *Leigh*, 39 Fed. 764, it was held that, where machinery subject to letters patent in the United States and Great Britain had been manufactured and sold to the importer in England, the royalty fees for its use paid by the purchaser in this country, which formed no part of the price in England, were not a part of its dutiable value.

We find no error in the decision of the court below that the said minimum royalties, aggregating $100,000, did not constitute a part of the purchase price of the merchandise here involved, and should not be included as part of such purchase price.

The next question for consideration is whether or not there is any substantial evidence in the record to support the finding of the lower court that the export value of the merchandise was the invoice price thereof, viz, $192,700, plus packing, the Government having raised this question by proper assignments of error.

It appears that the plant in question and others of a similar nature sold for exportation to the United States are purchased upon order, and require about five months to manufacture. It is conceded that there was no foreign value of such merchandise.

Upon the trial before the single judge sitting in reappraisement it was incumbent upon appellee to show the export value of the involved merchandise, entered under the Tariff Act of 1922, in accordance with the provisions of section 402 (c) of said act; and, as to the merchandise entered under the Tariff Act of 1930, it was incumbent upon appellee to show its export value in accordance with the provisions of section 402 (d) of said act. Each of the sections of the respective acts above referred to provide that—

(d) Export Value.—The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, * * *.

That the sale of said plant in Germany to appellee was a *bona fide* sale is conceded. In the case of *United States* v. *Malhame & Co.*, 19 C. C. P. A. (Customs) 164, T. D. 45276, we said—

* * * as a matter of law a single sale might establish an export value. But in order to do so it must appear from proof that such a sale accords with a free offering at that price—

to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, * * *.

The proof shows that a number of similar plants had been shipped to the United States by the same exporter that sold the plant here involved, under agreements similar to that made in the case at bar· for the payment of royalties by the purchasers for the right to use the patented process, but the prices paid by the purchasers of such plants were not proved.

Under our construction of paragraph 6 of the contract between the German seller and appellee, the provision for the payment of royalties did not affect the price of the plant itself, and it is unnecessary to consider whether the provisions of the contract for the payment of royalties for the right to use the patented process were in accord with a free offering of the plant at the invoice price of $192,700, for we find other provisions of the contract which, in our opinion, are not in accord with a free offering of the plant at said price.

By paragraph 2 of the contract the purchaser, the appellee; agreed to give the seller of the plant and its licensees under similar agreements—

the right to us any improvements and inventions which licensee may discover or acquire in the future during the term of this contract, either in said process *or in said plant and without any payment or royalty.* (Italics ours.)

This obligation assumed by appellee was, it seems to us, a material consideration flowing from appellee to the seller. We do not think that it can be assumed that the price of the plant would have been $192,700 had this obligation of appellee been omitted from the contract.

It is true that Dr. Edeleanu stated, over the objection of the Government, that he would be willing to sell a plant, either identical or similar to the plant here involved, at the same price as invoiced to appellee. We do not think that said testimony can be accorded any weight whatever in the determination of the export value of the plant in question. It was purely speculative as to what the witness might have done under a state of facts not shown to exist. *United States* v. *Traders Paper Co.*, 14 Ct. Cust. Appls. 293, T. D. 41909.

We are compelled to conclude that the invoice price of the plant in question does not constitute any substantial evidence that such invoice price was the export value of the plant, in view of the obligations assumed by appellee in said contract, above referred to, with respect to granting the seller and its licensees any rights to improvements and inventions in the plant which appellee might acquire, without any payment of royalty therefor by the seller to appellee, because the sale of the plant, with the condition above noted, does not accord with a free offering of the plant at the invoice price.

We find that there is no substantial evidence in the record that the invoice price of the plant was the export value thereof.

This being our conclusion, we hold that it was the duty of the single judge sitting in reappraisement, as to all the reappraisements under said Tariff Act of 1922, either to dismiss the appeal of the importer, or permit evidence establishing United States value, or cost of production of the plant if there were no United States value. *Meadows, Wye & Co.* v. *United States*, 17 C. C. P. A. (Customs) 36, T. D. 43324; *Chas. A. Johnson & Co.* v. *United States*, 17 C. C. P. A. (Customs) 107, T. D. 43432.

With respect to the reappraisement under the Tariff Act of 1930, it was the duty of the single judge sitting in reappraisement either to have sustained the appraisement or permit evidence establishing United States value, or cost of production of the plant if there were no such value.

The difference in procedure under the two tariff acts arises from the fact that in section 501 of the Tariff Act of 1930 it is provided that—

The value found by the appraiser shall be presumed to be the value of the merchandise and the burden shall rest upon the party who challenges its correctness to prove otherwise.

This provision is not found in the Tariff Act of 1922. In reappraisements under that act there is no presumption of the correctness of the value found by the appraiser, and the trial before the single judge is *de novo*. *United States* v. *Malhame & Co., supra.*

The final question for determination is whether we should reverse the lower court with respect to the reappraisements under the Tariff Act of 1922, and remand the case with directions to reverse the judgment of the single judge and order the dismissal of the appeal to reappraisement, and, with respect to the reappraisement under the act of 1930, whether we should affirm the judgment of the lower court in so far as it affirms the value of the merchandise involved therein fixed by the appraiser, or remand the entire cause to the lower court with directions to remand the same to the single judge for a new trial.

Our difficulty with the first-named procedure is that the lower court found the value of the plant as an entirety and did not separately find the values of the parts of the plant entered under the Tariff Act of 1922, and those entered under the Tariff Act of 1930. Inasmuch as it appears that the dutiable rate applicable to the parts of the plant entered under the act of 1922 was not the same as that applicable to the parts entered under the act of 1930, the values of the parts entered under the respective tariff acts should have been separately found.

However, in view of the fact that it appears that the sole issue litigated before the single judge sitting in reappraisement and before the Customs Court, First Division, on review, was whether the $100,000 minimum royalties hereinbefore referred to constituted part

of the purchase price of the plant, and in view of the fact that it is conceded that the appraiser added said royalties of $100,000 to the invoice price of the plant in arriving at his appraised value, and in view of the further fact that we have here found, as did the single judge and the lower court upon appeal, that said $100,000 constituted no part of the purchase price of the plant, we think the ends of justice require that the decision of the lower court be reversed with directions to remand the case to the single judge for a new trial upon all of the reappraisements involved, and we so hold.

This procedure is warranted under our decisions in the cases of *Chas. A. Johnson & Co.* v. *United States, supra,* and *Meadows, Wye & Co.* v. *United States, supra.*

The judgment appealed from is *reversed* and the cause *remanded* for further proceedings consistent with the views herein expressed.